UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **STEVEN B. ANDERSON**, | 2:18-CV-11133-TGB |
| Plaintiff, | |
| vs. | **ORDER** |
| **THOMAS WINN**, | |
| Defendant. | |

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS,
DENYING A CERTIFICATE OF APPEALABILITY, AND
GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

Steven B. Anderson, ("Petitioner"), a Michigan prisoner, filed this
action under 28 U.S.C. § 2254. Petitioner was convicted after a jury trial
in the Kalamazoo Circuit Court of first-degree premeditated murder,
MICH. COMP. LAWS § 750.316, assault with intent to commit murder,
MICH. COMP. LAWS § 750.83, felon in possession of a firearm, MICH. COMP.
LAWS § 750.224f, and three counts of possession of a firearm during the
commission of a felony. MICH. COMP. LAWS § 750.227b. Petitioner was
sentenced as a third-time habitual felony offender to a controlling

1

sentence of life imprisonment for the murder conviction and lesser terms for his other offenses.

The petition raises ten claims: (1) the prosecutor committed misconduct by introducing false testimony, (2) Petitioner was denied the effective assistance of trial and appellate counsel, (3) the trial court erred in admitting hearsay, (4) the trial court erred in failing to intervene when the prosecutor committed misconduct, (5) the prosecutor engaged in additional acts of misconduct, (6) the prosecutor withheld exculpatory evidence, (7) Petitioner's trial counsel was ineffective for additional reasons, (8) the trial court lacked jurisdiction, (9) the jury's verdict was against the great weight of the evidence, and (10) the ineffectiveness of Petitioner's appellate counsel constitutes cause to excuse any procedural default of the claims raised on state post-conviction review.

The Court denies the petition because Petitioner's claims are without merit or barred by his state court procedural default. The Court also denies Petitioner a certificate of appealability, but grants permission to appeal *in forma pauperis*.

# I. Background

The Michigan Court of Appeals summarized the facts surrounding

Petitioner's case as follows:

> The prosecution arises out of a shooting in Kalamazoo
> in which one man was killed and a second man was injured.
> There was strong evidence reflecting that the attack on the
> two victims was perpetrated by Anderson, Wright, who had
> allegedly been assaulted weeks earlier by, among others, the
> homicide victim, and Jaquan Henderson, who was convicted
> of second-degree murder and other charges following a
> separate trial. The evidence showed that, during the
> commission of the offenses, Wright wielded and fired a .44
> caliber handgun, Henderson employed a .380 caliber weapon,
> and that Anderson discharged a shotgun. The evidence
> further indicated that the surviving victim had been struck by
> shotgun fire, while the deceased was hit by a gunfire from a
> .44 caliber firearm.

*People v. Anderson*, 2014 WL 2931820, at *1 (Mich. Ct. App. June 26,

2014).

The evidence presented at trial indicated that on December 17,

2011, Romney Hunter and other men assaulted and robbed Robert

Wright. Wright was hospitalized after the assault. Wright told the police

he did not know who assaulted him.

A few weeks later, during the early evening hours of January 8,

2012, Hunter and Troy Whitfield were standing outside a residential

address in Kalamazoo, while friends were drinking and working on a

vehicle parked in the driveway. Whitfield heard shots, so he jumped in the back of the vehicle, and he and two other men drove away. Whitfield sustained two shots to his leg.

When Whitfield and the others returned to the scene, Whitfield saw Hunter lying on the ground at the end of the driveway. Hunter had been shot in the chest and killed. An ambulance arrived and transported Whitfield to the hospital.

On the ground at the scene of the shooting the police found Petitioner's cell phone. They also found several spent casings and an empty 12-gauge shotgun shell. A shotgun consistent with the shell found at the scene was subsequently located in the Kalamazoo River.

Santrell Sandifer testified that on January 8, 2012, he was with Petitioner when Petitioner saw Hunter. Petitioner called Wright and told him that he spotted one of the guys that jumped him. They met up with Wright, and Petitioner handed him a handgun. Henderson was also present. Sandifer was charged with two counts of accessory after the fact and testified as a prosecution witness pursuant to a plea agreement.

Sandifer testified that Petitioner, Wright, and Henderson walked towards the house where the shooting eventually happened, while

Sandifer drove past them. Sandifer heard gunshots. He saw Petitioner running through a field, and he saw Henderson and Wright running down the street.

Petitioner got in Sandifer's car and they drove to Bernice Wyatt's house; Wyatt was Petitioner's girlfriend. Sandifer saw Petitioner pull a shotgun out of his pants leg. Petitioner said that the shotgun jammed and that he had lost his cell phone. (The shotgun later found in the Kalamazoo River, which matched the shotgun shell discovered at the scene of the shooting, was also jammed.) Sandifer later heard Petitioner call Wyatt and tell her to have someone take the guns to his sister's house.

Joshua Shoffner testified that he was friends with Petitioner. He identified photographs of the men brandishing guns that were consistent with those used in the shooting. On the evening of January 8, 2012, Shoffner was at Wyatt's home. Petitioner told Shoffner that he was present at a shooting and that his shotgun jammed after he shot it. Petitioner also said that he dropped his cell phone at the scene.

Later, at Wyatt's direction, Shoffner took a garbage bag to another house. He saw the barrel of a shotgun poking out of the bag. The next

morning Shoffner heard Petitioner talking to someone on the phone about getting rid of something in the river.

Claudia Ford testified that Wright was the father of her children. On January 8, 2012, Ford heard Wright call Petitioner and Henderson. She was also present in the car with Wright when he met Petitioner and Sandifer. She did not see any guns, but she heard a reference to the shotgun. Ford testified that they drove to the area of the shooting, and Henderson and his brother arrived in another vehicle. Ford testified pursuant to a plea agreement in a pending drug case.

Ford observed Wright, Petitioner, and Henderson walk off. She did not see any weapons. Ford heard gunshots. She saw Henderson get into one vehicle while Wright walked back from the location of the shooting.

Sheila Mister testified that a few days after the shooting, Shoffner brought a black garbage bag to her home. He placed it on her back porch, where it remained until it was removed a few days later.

Prior to Petitioner's trial, co-defendant Jaquan Henderson was tried and convicted of second-degree murder. When the prosecutor called Henderson as a witness, Petitioner's counsel objected, arguing that the prosecutor was knowingly presenting false testimony. Defense counsel

noted that Henderson testified in his own defense at his trial that he lied to the police during interviews, and that the prosecutor conducted a lengthy cross examination "where it was apparent that [the prosecutor] caught Mr. Henderson, again, even lying during his own trial." ECF No. 8-10 PageID.696.

Defense counsel indicated that she had reviewed Henderson's trial transcripts, and that "it was very apparent to the prosecution that he was not truthful at his own testimony. There were numerous pages where he was cross-examined by the – by the prosecutor where it came off that he was not truthful. So, I – I have no faith that this man will uphold his oath to tell the truth today. He's not been truthful up until this point." *Id*. at PageID.696–97.

The prosecutor responded:

> [W]hat was given in terms of any, I guess, incentive to testify on Mr. Henderson's behalf is that when he testifies, the thing that I can do for him is, I will write to the prison as it relates to his cooperation in this matter and I will explain fully what he has done in that regards. It was also discussed with his appellate attorney and that Mr. Henderson should be aware, that if his appeal somehow was successful that anything he says here in court today that he could not be facing charges on any more serious matter if it went back, because that was first-degree open – murder back then. The jury came with second-degree. So, whatever happens here, if his appeals granted, it would still go back and he would be

subject to not the more serious first-degree – life time without parole offense. And, I believe that Mr. Henderson was made aware of that.

*Id.* at PageID.699–700.

The trial court overruled the objection, stating:

That's certainly something that the attorneys can explore given what was indicated in the police reports. I don't know what's in there. I don't have those in front of me. Given his testimony at trial – but, I'm not here to make a decision as to whether or not somebody's lying or not. That's up to the jury. They can certainly make that determination on their own, and unfortunately there are folks that do not tell the truth under oath. And, again, that's for the jury to sort out. I don't – I'm not aware of any authority I have to exclude someone just because they have said an inconsistent statement, or again, have lied in the past. That's not for me to determine. That's for all of you to question with regards to cross-examination.

*Id.* at PageID.700.

Defense counsel renewed the objection later in the trial, noting that Henderson had taken a polygraph examination which indicated he was being deceptive. ECF No. 8-11 PageID.755–56. The prosecutor informed the court that the polygraph questions related to a firearm and what he may have done with it during the commission of the offense. The detectives then re-interviewed him, and he gave further information. *Id.* at PageID.756. The prosecutor added, "Let's be clear, I'm not putting up

a witness who I believe will lie intentionally about any material fact in this case." *Id*. at PageID.756–57.

Henderson testified that he was then in prison because of his role in the shooting. He was testifying in exchange for the prosecutor writing a letter to the prison authorities. Henderson testified that had known Wright for about a year. Henderson met Petitioner on the night of the incident. On January 8, 2012, Wright called Henderson and told him to meet him in a residential neighborhood. When Henderson arrived, Wright asked him to beat up a guy who was around the corner because the guy had jumped him.

Petitioner and Sandifer then arrived. Wright told Petitioner that he was going to have Henderson "whoop" the guy. Petitioner said "I ain't come to watch nobody fight. I'm fixin' to body one of them." *Id*. at PageID.716. Petitioner showed Henderson a pistol-gripped shotgun that was underneath his sweatshirt.

The three men walked to the scene of the shooting. Petitioner fired the first shot with the shotgun toward Whitfield, but then Henderson saw Petitioner struggle with the gun. Petitioner told Henderson to shoot. Henderson testified that he fired a handgun in the air several times.

Henderson ran away, and he heard more shots fired. He did not see if Wright fired any shots.

Sandifer drove up in a vehicle and Petitioner jumped inside. The men went their separate ways, and Henderson threw his handgun away. Later, Wright told Henderson that Petitioner dropped his cell phone during the incident. Henderson subsequently discarded the shotgun used in the incident in the river. He later told the police where he threw it.

On cross-examination, Henderson testified that he was serving a 35-to-80-year sentence, and that the prosecutor had agreed to write a letter to the prison on his behalf. Henderson claimed that he was testifying at the instant trial to bring closure to Hunter's family because they needed to know who shot Hunter.

Henderson admitted that he had lied to the police when they interviewed him prior to trial. He had an ongoing relationship with Detective Ghiringhelli as a paid informant. Henderson was trying to pump him for information, and he was trying to steer Ghiringhelli in another direction. Henderson decided to be truthful after the police showed him that his cell phone number was involved. He admitted that he met with the police on several occasions, that he made lengthy

statements, and that he told them "partly truth and partly lies." *Id*. at PageID.758, 825.

Henderson admitted that in his first statement to Ghiringhelli, he untruthfully said he was shooting dice at the time of the incident and not involved. His second statement was to Detective Beauchamp, in which he admitted he was involved in the incident, but he lied about certain details. The third statement was to a few other detectives, and Henderson admitted he lied again about several details.

Henderson's brother, Daniel Jones-Davis, testified that he drove with his brother to the scene of the shooting. Jones-Davis heard shots, and Henderson ran back to his vehicle. He did not see Henderson with a firearm. He later dropped his brother off near two bridges, but he didn't know what his brother did at the bridges.

Detective Michael Hecht testified that he interviewed Petitioner on January 11, 2012. Petitioner initially said that he was at Wyatt's home at the time of the incident. He said he lost his cell phone earlier that day. After Hecht told Petitioner that they found his at the scene, the interview ended.

Detective Brian Beauchamp testified that he reviewed phone calls made at the jail between Shoffner and Petitioner, during which the men used nicknames for two of the guns used in the shooting. Cell phone records were admitted showing communications between Petitioner, Ford, Henderson, Constance Searcy, Wright, and Wyatt around the time of the incident.

Following his conviction and sentence, Petitioner filed a claim of appeal in the Michigan Court of Appeals. His brief on appeal raised the following claims:

> I. Is Defendant entitled to a new trial where he was denied his state and federal due process rights where his convictions were obtained through the use of false and/or perjured testimony by co-defendant Jaquan Henderson, and where the prosecutor presented inconsistent theories during the July trial of co-defendant Henderson and the instant trial of Mr. Anderson?
>
> II. Did the trial court commit plain error in failing to instruct the jury that it should view with caution the testimony of Santrell Standifer, Claudia Ford, and Joshua Shoffner, who were accomplices during and/or after the fact to Mr. Anderson's alleged crimes? Did this deny Mr. Anderson his state and federal constitutional right to present a defense?
>
> III. Alternatively was Petitioner denied his state and federal constitutional right to the effective assistance of counsel, where trial counsel failed to request a cautionary instruction on the unreliability of accomplice testimony with regard to Sandifer, Ford and Shoffner?

Petitioner also filed a supplemental pro se brief in which he raised

the following additional claim:

> Was Defendant's right to a fair trial contaminated, compromised and ultimately corrupted through a series of errors perpetrated by defense counsel?

The Michigan Court of Appeals affirmed Petitioner's convictions in

an unpublished opinion. *Anderson*, 2014 WL 2931820, at *7.

Petitioner subsequently filed an application for leave to appeal in

the Michigan Supreme Court, raising the same claims that he presented

to the Michigan Court of Appeals, along with the following new claims:

> I. Defendant's due process of rights were violated. Key components as defined in MCR 8.119(C) and MCR 2.107(G) were not followed, making my arrest a violation of my due process of rights.
>
> II. Prosecutorial misconduct[:] prosecutor violated my state and federal constitutional rights by failing to give exculpatory evidence to the defense. Brady violation.
>
> III. The aiding and abetting law is unconstitutional and has deprived me the rights to a fair trial.

The Michigan Supreme Court denied the application because it was

not persuaded that the questions presented should be reviewed by the

Court. *People v. Anderson*, 858 N.W.2d 454 (Mich. 2015) (Table).

Petitioner returned to the trial court and filed a motion for relief from judgment, raising the following claims:

I. The Defendant was denied his state and federal constitutionally protected right to effective assistance of counsel where counsel failed to present a defense, investigate and call witnesses to testify in Defendant's favor, denying him compulsory process.

II. The trial judge abused her discretion, violating Defendant's due process and rights to a fair trial when she failed to stop the prosecutor's prejudicial actions.

III. The trial court abused its discretion and reversibly prejudiced the Defendant when admitting hearsay testimony into evidence which violated the Confrontation Clause. Trial judge further abused her discretion in allowing jury instructions, that relieved the prosecution of its burden of proving every element of the first-degree murder charge beyond a reasonable doubt.

IV. The verdict is against the great weight of the evidence, constituting in a miscarriage of justice, violating Defendant's Fourteenth Amendment right.

V. Defendant is entitled to relief from judgment where misconduct clearly demonstrates that a fraud was perpetrated upon the court by the prosecutor.

VI. Defendant was denied due process of his constitutional rights where the prosecutor suppressed exculpatory and impeachment evidence and where law enforcement failed to collect evidence in bad faith, preventing the Defendant from having a fair trial.

VII. Trial counsel's failure to object to the criminal complaint rendered her ineffective. Jurisdictional defect, due process,

and unlawful detainment all arose out of the invalid, insufficient criminal complaint violating multiple state and federal rights of the defendant.

VIII. Defendant inserts that his equal protection rights were violated where the district judge abused her discretion in binding Defendant over on open murder charges and where circuit court judge abused her discretion in denying motion to quash bind over.

The trial court denied the motion for relief from judgment under Michigan Court Rule 6.508(D)(2) and (3), finding that review of the new claims was barred by Petitioner's failure to show that his appellate counsel was ineffective for failing to raise the claims on direct review. ECF No. 8-22.

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals. The court denied the application for leave to appeal for failure to establish that the trial court erred in denying the motion for relief from judgment. *People v. Anderson*, No. 335589 (Mich. Ct. App. April 4, 2017). Petitioner appealed this decision to the Michigan Supreme Court, but his application for leave to appeal was denied under Michigan Court Rule 6.508(D). *People v. Anderson*, 908 N.W.2d 887 (Mich. 2018) (Table).

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003), quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case."

*Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (internal quotation omitted).

### III. Analysis

### A. Prosecutorial Misconduct

Petitioner first claims that the prosecutor committed misconduct by eliciting false testimony from Henderson. He argues that the prosecutor

maintained during Henderson's trial that he was untruthful, but then reversed course during Petitioner's trial by calling him as a witness and urging the jury to believe his testimony in the later proceeding.

After reciting the controlling constitutional standard, the Michigan Court of Appeals denied relief on the merits by finding that the prosecutor did not take contradictory positions with respect to Henderson, and Petitioner did not show that the prosecutor knew his testimony to be false:

> Anderson focuses on statements made by Henderson at both Henderson's trial and at Anderson's trial, wherein Henderson testified that Anderson had a shotgun, that Anderson threatened him with the shotgun and made him stay at the scene, that Anderson made him fire his .380 caliber weapon, that Anderson fired first at one of the victims, that Henderson simply fired his gun into the air, and that part of the plan had been to rob the victims and shoot them if they attempted to use a gun.

> Initially, we point out that Anderson fails to supply any relevant support for his conclusory position that Henderson's testimony was false. Indeed, Anderson's appellate claims indicate that Henderson's testimony at the two trials was consistent. Anderson argues that the prosecutor at Henderson's trial adamantly maintained to the jury that Henderson was a liar, yet that very same prosecutor at Anderson's trial vigorously contended that Henderson was a credible witness. It appears, therefore, that Anderson's theory is that Henderson's testimony at Anderson's trial was false, given that the prosecutor accused Henderson of lying at Henderson's trial, and that the prosecutor thus knowingly

used false testimony at Anderson's trial. We fail to see how this theory necessarily establishes the falsity of Henderson's testimony. Moreover, at Henderson's trial, the prosecutor never asserted that Henderson was lying about Anderson being involved and participating in the offenses, about Anderson providing assistance in carrying out the crimes, about Anderson wielding a shotgun, and about Anderson first discharging the shotgun. On these matters, the prosecutor's theory at both trials was entirely consistent.1 Rather, at Henderson's trial, the prosecutor challenged Henderson's credibility regarding his claims that he only thought that a beating would take place, not a shooting and killing, that Anderson forced him to fire his gun, and that Henderson innocently shot into the air in response. At Anderson's trial, the prosecutor's arguments that Henderson was credible were not expressly linked to Henderson's intent or his belief as to whether or not a shooting would occur, to Anderson forcing Henderson to fire his gun, or to Henderson shooting skyward. In fact, the prosecutor specifically acknowledged to the jury that Henderson clearly was "not clean" and had been deeply involved in the offenses, firing his .380 caliber weapon. Furthermore, Henderson's criminal intent and discharge of his weapon ultimately did not have any meaningful bearing on Anderson's guilt. Assuming that any of Henderson's testimony at Anderson's trial was tainted, it was not material to Anderson's guilt and did not affect the jury's verdict, especially considering the overwhelming evidence of Anderson's guilt, including admissions to friends and physical evidence, aside from Henderson's testimony. *Aceval*, 282 Mich. App. at 389. Reversal is unwarranted.

[FN 1:] As such, the prosecutor did not present "inherently factually contradictory theories," given that there was no inconsistency at the core of the prosecutor's cases against defendants for the same crime. *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000).

[FN 2:] We note that, although Henderson made inconsistent statements to police prior to the trials, the statements were not concealed by the prosecutor and Anderson freely used them in an attempt to impeach Henderson's credibility.

*Anderson*, 2014 WL 2931820, at \*1–2.

This decision did not involve an unreasonable application of clearly established Supreme Court law. "The deliberate deception of court and jury by the presentation of testimony known to be perjured violates a defendant's due-process rights." *Monea v. United States*, 914 F.3d 414, 421 (6th Cir. 2019) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)) (internal quotation marks omitted); *see also Giglio v. United States*, 405 U.S. 150, 153 (1972). "To prevail on such a claim, [the petitioner] must show that the Government knowingly presented false testimony that materially affected the proceeding." *Monea*, 914 F.3d at 421 (citing *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)). A petitioner cannot simply point to "[m]ere inconsistencies in the testimony," but must show that the testimony is "indisputably false." *Id.* (quoting *Lochmondy*, 890 F.2d at 823) (internal quotation marks omitted).

As the state court reasonably concluded, Henderson's testimony at the two trials was fairly consistent. At both proceedings he minimized his own involvement in the crime and shifted blame to the other men. Petitioner fails to identify exactly what portion of Henderson's testimony is indisputably false. Rather, he argues only that Henderson was an unreliable witness because he lied to the police, failed a polygraph examination, and because the trial prosecutor argued in closing that Henderson minimized his involvement and was still not being completely truthful. But the prosecutor did not attempt to pass indisputably false testimony off as the truth at Petitioner's trial. Rather, the prosecutor properly argued that the portion of Henderson's testimony describing Petitioner and Wright's involvement in the shooting was true despite his efforts to minimize his own culpability. The prosecutor openly acknowledged the problems with Henderson's credibility as to his own culpability. The jury was not misled, and in any event, pointing to mere inconsistencies in Henderson's testimony does not show that the prosecutor committed reversable misconduct. *Lochmondy*, 890 F.2d at 822.

Moreover, a habeas petitioner is not entitled to relief based on trial court error unless he demonstrates that the error "had a substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993); *Holland v. Rivard*, 800 F.3d 224, 243 (6th Cir. 2015). A showing of "substantial and injurious effect or influence" means "actual prejudice." *Gover v. Perry*, 698 F.3d 295, 299 (6th Cir. 2012) (citing *Brecht*, 507 U.S. at 637).

The success of the prosecution in no way hinged on Henderson, significant as he was. Aside from Henderson, multiple witnesses testified to Petitioner's involvement in the crime and his incriminating statements and actions following the shooting. The accounts of these witnesses were corroborated by the fact that Petitioner's cell phone was found at the scene and the shotgun was found in the river. Any error in the admission of Henderson's testimony did not have a substantial impact on the outcome of the trial.

Petitioner's first claim is without merit.

## B. Ineffective Assistance of Trial Counsel

Part of Petitioner's second claim was raised in on direct appeal in his pro se supplemental brief. Petitioner claims that his trial counsel was

ineffective for failing to call a number of witnesses in his defense and for a variety of other reasons. After reciting the controlling constitutional standard, the Michigan Court of Appeals rejected the claim on the merits as follows:

> Anderson argues that defense counsel failed to interview and call several lay witnesses to testify in regard to whether the victims and/or their friends may have also had guns at the scene of the shooting and to impeach a witness who testified against Anderson. In support, Anderson relies solely on his own unsworn affidavit. "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *Carbin*, 463 Mich. at 600. The unsworn affidavit falls woefully short of establishing the factual predicate for Anderson's claim, i.e., establishing what these other purported witnesses would have testified to had they been called to the stand. Moreover, the requisite prejudice has not been established. Even had the victims been carrying guns, the evidence overwhelmingly showed that the victims were effectively ambushed, not that Anderson, Wright, and Henderson fired in self-defense. And the impeachment of the one witness would not have affected the outcome of the trial in light of the extensive evidence of Anderson's guilt.

> Anderson also argues that defense counsel was ineffective for failing to call an expert witness on firearms. Anderson, however, has not shown that counsel failed to investigate the possibility of an expert and, in the absence of how an expert would have testified, Anderson has not overcome the strong presumption that counsel's decision not to call an expert was sound trial strategy, nor has prejudice been established. *Carbin*, 463 Mich. at 600.

Related to counsel's investigation of Anderson's case, Anderson also alleges on appeal that counsel failed to explore: evidence of other potential weapons, evidence of another shooter, and the origins of the weapons used in the shooting to establish that Anderson had no connection to the guns. These claims are not well-developed and nothing in the record indicates that counsel failed to investigate these matters or that, had these issues been explored, there was a reasonable probability of a different outcome (prejudice). *Carbin*, 463 Mich. at 600. Anderson has not satisfied his burden of establishing the factual predicate of his claims. *Id*.

Anderson next maintains on appeal that defense counsel infringed on his right to testify. Informed on the record that he had a right to testify, Anderson stated that he was not going to testify, thereby waiving his right to do so. See *People v. Simmons*, 140 Mich. App. 681, 685 (1985). On appeal, he has not presented any support for his claim that counsel advised him unreasonably or even that, but for counsel's performance, he would have testified. Reversal is unwarranted.

*Anderson*, 2014 WL 2931820, at *4–5.

This decision was a reasonable application of the law. To establish ineffective assistance of counsel, a defendant must show both that: (1) counsel's performance was deficient, i.e., "that counsel's representation fell below an objective standard of reasonableness"; and (2) the deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The test for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Given that Petitioner did not proffer the state courts with any evidence to support his claims of ineffective assistance of trial counsel, it was not unreasonable for the state appellate court to find that he did not overcome the presumption that trial counsel's alleged failings were the result of reasonable trial strategy. The state court did not have before it any evidence showing that counsel inadequately investigated the case or failed to present additional defense evidence. Moreover, as the state court found, the evidence presented at trial overwhelmingly indicated Petitioner's guilt. Petitioner made damning admissions to multiple witnesses following the incident. His presence at the scene was corroborated by his dropping his cell phone, and his involvement was further established by evidence indicating that his shotgun was found in the river where he directed it to be discarded, and in the jammed

condition that he described. On this record, Petitioner has failed to show that his counsel performed deficiently or that there was a reasonable probability that the result would have been different but for his counsel's alleged failings.

Moreover, habeas review under 28 U.S.C. § 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Petitioner offered the state courts only his own affidavit claiming that he had additional witnesses to present in his defense. Petitioner offered no evidence to prove the content of the missing testimony or the availability of other witnesses. He therefore failed to establish in the state courts that his counsel performed deficiently or that he was prejudiced. See *Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007) (citing *Stewart v. Wolfenbarger*, 468 F.3d 338, 353 (6th Cir. 2006)).

The state adjudication of the ineffective assistance of trial counsel claims raised on direct review was reasonable. Petitioner has failed to demonstrate entitlement to relief with respect to this claim.

## C. Procedural Default

Petitioner's remaining claims were presented to the state courts in his motion for relief from judgment and the appeal that followed its denial. Petitioner claims that his appellate counsel was ineffective for failing to raise these claims on direct appeal. The trial court found review of the claims barred under Michigan Court Rule 6.508(D)(3) because Petitioner failed to demonstrate "good cause" by way of his ineffective assistance of appellate counsel claim. *See* ECF No. 8-22. The Michigan Court of Appeals and Michigan Supreme Court subsequently denied relief in short orders.

When the Respondent in a habeas case raises a procedural default defense, as here, the district court must address it before reaching the merits of the defaulted claims, especially when the procedural default question is clear. *Sheffield v. Burt*, 731 F. App'x 438 at 441 (6th Cir. 2018).

If a claim is not considered by a state court "due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review." *Seymour v. Walker*,

224 F.3d 542, 549–50 (6th Cir. 2000) (citing cases). It is well-established that Rule 6.508(D)(3) is such a rule, and that its application by the state court bars habeas review of the defaulted claims. *Amos v. Renico*, 683 F.3d 720, 733 (6th Cir. 2012); *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003). The state trial court applied this rule to Petitioner's post-conviction claims, and they are therefore barred from review absent a showing of cause and prejudice or that a failure to review the defaulted claims would result in a fundamental miscarriage of justice. *Guilmette v. Howes*, 624 F.3d 286, 289–92 (6th Cir. 2010) (en banc); *Wainwright v. Sykes*, 433 U.S. 72, 84–87 (1977).

Petitioner claims that the ineffectiveness of his appellate attorney constitutes cause to excuse his procedural default. Ineffective assistance of appellate counsel can establish cause for a procedural default. See *Ivory v. Jackson*, 509 F.3d 284, 294 (6th Cir. 2007). However, appellate counsel does not need "to raise every nonfrivolous claim on direct appeal." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002). A petitioner can overcome the presumption of effective assistance of counsel only when the "[omitted] issues are clearly stronger than those presented." *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). A petitioner

must show that the claims he contends should have been raised on appeal were "dead-bang winner[s]." *Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003), aff'd, 104 F. App'x 461 (6th Cir. 2004). "A 'dead-bang winner' is an issue which was obvious from the trial record . . . and one which would have resulted in a reversal on appeal." *Id.* (internal citations and quotation marks omitted).

Petitioner's post-conviction review claims were not dead-bang winners, and so appellate counsel was not ineffective for failing to raise them. Appellate counsel raised reasonable claims on direct appeal, the first one of which still forms Petitioner's lead claim. Moreover, for the reasons stated by the trial court in rejecting Petitioner's post-convictions claims on the merits in the alternative, Petitioner has failed to show that his procedurally defaulted claims have any merit, let alone that they were "dead-bang winners." *Bason v. Yukins*, 328 F. App'x. 323, 324 (6th Cir. 2009). Petitioner has failed to demonstrate cause to excuse his default.

As Petitioner's claims lack merit or are barred from review, the petition will be denied.

## IV. Certificate of Appealability

Before Petitioner may appeal this decision, the Court must determine whether to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted).

The Court finds that reasonable jurists would not debate the resolution of Petitioner's claims because they are devoid of merit or barred from review. The Court will therefore deny a certificate of appealability.

If Petitioner chooses to appeal the Court's decision, however, he may proceed in forma pauperis because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, **DENIES** a certificate of appealability, and **GRANTS** permission to appeal in forma pauperis.

**SO ORDERED.**

DATED April 30, 2019

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, April 30, 2019, by electronic and/or ordinary mail.

S/A. Chubb
Case Manager and Deputy Clerk